I'm delighted to hear from the University of Virginia Law School. Good morning. Good morning, Your Honor. Thank you. As Director of the Appellate Litigations Clinic at the University of Virginia School of Law, I'd like to introduce to the Court this morning two third-year law students, Erin Gallaher and Brennan Curtis, who satisfy this Court's requirements for student practice and who have the incentive or client to argue this point. Ms. Gallaher will do the opening and Mr. Curtis will do the follow-up. Okay, great. Ms. Gallaher. Good morning. Just relax now. It's not that big a deal. You're going to live at the end of it, I think. I hope so. May it please the Court, my name is Erin Gallaher, counsel for Appellant Calvin Gray. This case is here on appeal from the dismissal of Mr. Gray's petition for writ of habeas corpus in the United States District Court for the Southern District of West Virginia. That court disposed of Mr. Gray's petition on a threshold motion to dismiss, despite the fact that he had plausibly pled that he was both timely and diligent under AEDPA. But the underlying reason that we're here today is because in 2006, the Supreme Court of Appeals of West Virginia issued Zane III, which was the culmination of a significant factual investigation into serious problems with the West Virginia State Trooper's serology department. Zane III considered those problems through the lens of eight cases that had suffered from testimony by West Virginia serologists, and Mr. Gray's case was one of those cases. That investigation, the factual report, found several errors with Trooper Myers, the state serologist in Mr. Gray's case, with his underlying work and with his testimony at the 1991 trial of Mr. Gray for the murder of Artisa Bennett. Tell me, how is this blood evidence even relevant? Because your client took the stand, and he testified to all these things that happened. So there's blood around. There's a stabbing. But he said he hauled off the bodies. He did say that, Your Honor. And the difference in this case really came down to the difference between the state's account, which had Mr. Gray stabbing Ms. Bennett more than 50 times on Tank Hill, and Mr. Gray's own account, which, as you noted, had him putting Ms. Bennett's body in the car and then simply disposing of it on Tank Hill. But the blood evidence is significantly relevant there. Trooper Myers testified in particular to a pair of pants that Mr. Gray allegedly wore on the day that Ms. Bennett died. And Trooper Myers testified that those pants tested positive for human blood and that they tested positive for Ms. Bennett's blood. But the Zane III report found that that was a gross exaggeration of Trooper Myers' underlying work and that he had, in fact, altered some of his underlying test results that supported that testimony. Trooper Myers also didn't testify or did not even report a pair of shoes that Mr. Gray also wore that day and that he conducted testing on. And the testing done on those shoes affirmatively excluded Ms. Bennett's blood from being present on those shoes. And, of course, the state's version of the case has, again, Mr. Gray stabbing Ms. Bennett more than 50 times on Tank Hill. The state's attorney said in its closing, dead people don't bleed all over the ground. That's a clear indication that the state was attempting to tell the jury Ms. Bennett was stabbed on this hill because her blood was on this hill. And what's the newly discovered evidence that you claim in this case? There are two pieces of newly discovered evidence that Mr. Gray raises. The first was the 2006 Zane III report and the fact findings therein specifically. That's a legal decision. How can that be a factual predicate and newly discovered evidence? Zane III is a legal opinion, and, of course, several circuits have found that legal opinions, abstract legal opinions, can't be fact predicates. Has this circuit? This circuit has not. But Zane III also contained a significant fact investigation. It contained the results of that investigation that was ordered by the Supreme Court of Appeals, West Virginia, and it is that fact investigation that Mr. Gray relies upon to form the factual predicate in 2006. And so he's not looking to the legal opinion of that court. He's looking to the fact investigation that was appended to the legal opinion. There's another fact predicate. Sorry, Your Honor, to your question. Can I get you to go back to Judge Floyd's question? Of course. I listened to your explanation, but I don't understand how this blood testimony makes his story more plausible or the State's theory less plausible or probable. The State's serologist was put on the stand to corroborate the testimony, to support the testimony of two minor witnesses to various pieces of the crime. Neither of those witnesses, though, either saw Mr. Gray with a knife in his hand, nor did they see Mr. Gray actually kill Ms. Bennett, or at least they didn't testify to that. And so the presence of significant blood or the lack of significant blood on shoes worn by Mr. Gray does go to the plausibility of whether he stood in front of Ms. Bennett and stabbed her more than 50 times, which the State has indicated might leave some blood on his shoes, or whether she was already dead when he deposited her on Tank Hill. There is, of course, another factual predicate here, which is the 1998 discovery by Mr. Gray of his own blood type. And he discovered that in 1998 as the result of a routine medical procedure, and he filed his first State habeas petition 10 months after he made that discovery. I don't recall the trooper ever testifying about what his blood type was. Trooper never specifically said Mr. Gray has type B blood, but he did testify that the blood that was on that van used by Mr. Gray to bring Ms. Bennett to Tank Hill had blood on it that was consistent only with Mr. Gray's blood. And so even though he didn't testify as to the specific blood type of Mr. Gray or of Ms. Bennett, his testimony still bled the fact that he had done that blood testing. He had to have that blood type correct in order to make an accurate comparison. Exactly, Your Honor. And this is relevant for several reasons, but most importantly, because Mr. Gray and his trial counsel didn't know that Trooper Myers had falsely testified at the time of his trial didn't know that Trooper Myers had falsely testified as to the correspondency of that blood type or falsely testified as or grossly exaggerated his testimony as to the presence of human blood on the van. So if you had had that evidence and used it to impeach the trooper, what difference would it have made in the outcome of this case? It might have made quite a difference, Your Honor, because, again, this was a closed case where no witness thought Mr. Gray actually stabbed Ms. Bennett. The jury didn't have any doubt as to Trooper Myers' testimony at the time of the trial in 1991 because all they saw was a basic cross-examination without the benefit of the knowledge that Trooper Myers had made, at the very least, made significant mistakes and, at most, had intentionally altered some of this underlying test work that he had done and skewed his testimony here. The jury didn't know that they should question Trooper Myers and, therefore, didn't know that they should question Trooper Myers' corroboration of those two minor witnesses. And that might have made all the difference in a case like this where, again, nobody actually saw Mr. Gray kill Ms. Bennett. Nobody saw him with a knife in his hand. This was a very circumstantial case. At some point before you finish, I want to hear you on the question of exhaustion of estate court remedies. Of course. I can talk about that now, Your Honor. Okay. Great. And so, of course, in our brief, we noted that Mr. Gray feels that he has shown inordinate delay here clear in its face because it's been 18 years since Mr. Gray filed his first state habeas petition back in 1998. It's been a full decade since he filed his second state habeas petition in 2006, and it's been three years since he filed this federal habeas petition, and the state court still has not made a ruling. Do you have any published authority to support your inordinate delay as an exception argument? This court has, of course, an unpublished opinion, Holly, where in footnote one, it notes that this court has found inordinate delay on time frames as low as 20 months, 19 months, even one year. Mr. Gray's 18 years and 10 years clearly exceed that. Even going on the state's opinion, which is that Mr. Gray caused some of this delay, the state starts attributing the delay to Mr. Gray in 2004 with the filing of his amended petition. What's the status in the state now, in the state proceeding? West Virginia. It's moving, isn't it? It's moving now, isn't it? It has just started moving, Your Honor. West Virginia just scheduled a status hearing for late May of 2017, and so there is some movement here, but, of course, there's no indication that that status hearing will stay in May or that that will lead to resolution of Mr. Gray's claims here. He has been waiting, again, 18 years, 10 years, and three years since the filing of this suit. He hasn't had any indication that West Virginia is proceeding with any haste through his state habeas claims, and so he feels that he has suffered from inordinate delay here. But even should this court not find inordinate delay on its face, it would be perfectly proper to remand to the district court, as the state has suggested, for consideration of that question because, of course, the district court did not decide inordinate delay. In the instant case, they mentioned it, they noted it would be a possible ground, but instead they decided on timeliness and on diligence. And that's an important question here because the district court didn't make any findings as to Mr. Gray's diligence in 2006. The district court said Mr. Gray was not diligent in 1998 because he could have had his blood tested. In so doing, they rejected Mr. Gray's own argument that, as a prisoner, he didn't have the opportunity that you or I might have to simply wave his hand and have his blood tested. But regardless, they didn't even reach the diligence question in 2006 because they simply combined Mr. Gray's 2006 claims. Did he have his blood taken in the early 1990s? He did have his blood drawn as part of the trial back in 1991, and his attorney at trial received a vial of his blood and was able to test that but didn't test that. And Mr. Gray didn't know that either. Mr. Gray didn't know that his attorney hadn't appropriately tested that blood. He didn't know that there were problems between the blood typing that Trooper Myers found and what Mr. Gray discovered serendipitously in 1998 as a result of that routine medical procedure. But the diligence question, even though it's close in 1998, is of a different character in 2006, and it's much clearer. In 2006, again, Mr. Gray learned through Zane III of these problems with Trooper Myers' testing, of his withholding of the evidence of the shoes and the fact that the shoe testing affirmatively excluded Ms. Bennett's blood, Mr. Gray's blood. Mr. Gray couldn't have learned of any of that prior to 2006. The Zane III investigation took the resources of the Supreme Court of West Virginia, finding two expert investigators, appointing them to conduct this investigation, and a lengthy investigation by those people. Mr. Gray simply didn't have those resources, and he didn't know that he should even be pursuing that line of questioning because, again, he didn't know, he couldn't have known, that Trooper Myers had made these serious mistakes. In 2006, Mr. Gray, that was the first time he learned of these problems. The state asserts that Mr. Gray could have done more, that he could generally have known of serology problems, but that's holding Mr. Gray to a standard that's beyond due diligence. Mr. Gray, again, could not have possibly known that there were these serious problems. He didn't know that he needed to test it, and so, therefore, he's clearly diligent, or at least plausibly diligent, under AEDPA, and that's all that he should have needed to show at the district court level, was that he was plausibly diligent and, therefore, plausibly timely. The basis for his claim, of course, is the way the blood was handled, the way the blood was identified, which is, and, of course, we know what the problems are with the lab in West Virginia. This, to me, is a peculiarly state problem, state-created, state-to-be-handled. Other than the good argument that it's been too long, our general inclination would be to let the state work this out first, since it's their problem, before the federal court steps in. Is there any other argument that you would make in response to that concern, other than the fact it's been so long, and they've had enough time to do it, and the issue needs to be resolved? I think that largely . . . The best argument you've got is that it's just been, they've had plenty of time, it's been long enough, let's move on. That is the best argument for Mr. Gray. And, Ms. Gallagher, when I asked about the state proceedings moving forward, you mentioned a May 2017 status conference, but more than that has happened recently in the state proceedings, hasn't it? According to the docket, on October 26, 2016, the state court judge entered an order granting petitioners' requests for expert witness services, fees, and testimony. So that's quite a bit more than just sort of a status conference. And was there a hearing also held on October 14, 2016? Yes, there has been some movement in Mr. Gray's state case since this was docketed. And so this court might find it appropriate to issue a stay or to tell the district court to issue a stay on remand to hear what West Virginia does. But again, Mr. Gray isn't particularly confident that West Virginia will proceed through these claims with any particular haste because they have not yet done so. Well, could we give them a time limit? Mr. Gray would love you to give them a time limit. If presuming it's exhausted by such and such a date, we'll defer action on it. Isn't that kind of a compromise solution? That would be a reasonable compromise for this court to, of course, hedge Mr. Gray's state resolution with a date of finality or a proposed date of finality. As a final matter, I just wanted to talk quickly about the standard of review. Of course, habeas matters in general, habeas dismissals in general are reviewed de novo. This court has reviewed those cases de novo. And the state proposes that as to the diligence question, it should be a clearly erroneous standard. They looked at the Second and Sixth Circuits to support this, although it is an issue of first impression here. And while clearly erroneous might be the appropriate standard for the diligence question, it's important to note that the Second Circuit, for instance, in Rivas, first remanded back to the district court for development of a substantial factual record as to due diligence. And that type of record is not present in this case. The district court below simply accepted the state's argument as to diligence in 1998. And as I mentioned earlier, they didn't address the 2006 diligence question whatsoever, simply attaching 2006 to 1998, saying it was part of cumulative evidence. And it's not. And because there is no factual record as to due diligence here, it would be inappropriate for this court to apply at this stage a clearly erroneous standard. The more appropriate resolution would be for this court to remand back to the Southern District of West Virginia to further develop that fact record as to due diligence, both in 1998 but particularly in 2006, where the record is just entirely devoid of any findings as to diligence in Mr. Gray's case. And then once that record has been developed, clearly erroneous might be the appropriate standard to apply, although in general, of course, de novo remains the appropriate standard. If this court has no further questions, I'll reserve the remainder of my time. Okay. Thank you. Thank you.  Good morning, and may it please the Court. I'm Albert Lin, Solicitor General for the State of West Virginia. With me at council table is Gordon Moe, an Assistant Attorney General. Your Honors, I first just want to make sure I clarify, of course, timeliness and exhaustion are independent bars. So our position would be you shouldn't reach the exhaustion question, although I'll be happy to address it toward the end of my argument, if you conclude that there is no extension of the timeliness issue under 2244d1d. And when evaluating a claim under 2244d1d for the newly discovered factual predicate for a claim, there are actually three questions that this court needs to answer. The first is, what is the claim for which Petitioner purports to have discovered new facts? The second is, what are the minimum facts needed to plead that claim? That's what every court that has considered this has said. That's what they call vital facts. And then third is, when could they have discovered, the petitioner or his counsel or her counsel, have discovered those minimum facts? So I think it's important to proceed in this fashion to make sure we understand what the claim is that we're talking about. And so what is the claim? The claim, if you look at the federal habeas petition, he incorporates by reference, he sets the attachment number six, his second state habeas petition. And the claim is the broad assertion that the state of West Virginia, and in particular Trooper Myers, presented tainted evidence. And I quote from JA69, quote, the state produced tainted evidence at trial in the form of the report and testimony of the serologist Howard Myers. And so what are the minimum facts necessary to plead that claim? And Mr. Gray, the petitioner, has told us what he thinks they are. And we agree, the minimum facts necessary. The minimum facts, not, and there's a whole line of cases in a bunch of other circuits that say, the important thing is to identify the minimum facts. Anything after that is cumulative. And the minimum facts are that the crime lab report got the petitioner's blood type wrong. And Mr. Gray himself says this, and he says it at JA71. He says, the blood sample analysis from the petitioner, this is, again, the second state habeas petition, which he incorporates by reference as his federal claim. He says, the blood sample analysis from the petitioner revealed a blood type of B positive. However, the petitioner's blood is A negative. Quote, if one item is tested in error, then there is a valid major issue concerning everything tested. His claim is a broad-based attack on the serological evidence and the testing done by Trooper Myers. And he himself has said that my discovery, the discovery that the blood type was incorrect, was sort of the opening salvo. That was enough for me to get in and make this claim. And so the question then is, with reasonable diligence, and the 11th Circuit has said that that means, quote, a reasonable investigation of all facts surrounding the prosecution. That's from a case called Beshears from the 11th Circuit. With reasonable diligence, when could he have discovered that his blood type was wrong? And as Magistrate Judge Tinsley and Judge Copenhaver said below, this could have been discovered before trial. I think first, as a general matter in any case, the state's position would be, a reasonable defendant and reasonable counsel, in a case where they know the state is going to rely on serological evidence, and the state has turned over a lab report that has blood types in it, that compares the blood types to the tested evidence, that it is reasonable to expect that the petitioner and his or her counsel would ask for independent testing, at a minimum, to find out the blood type. That's as a general matter. But in this case, we have even more. In this case, we have, as you heard our friend say, they had actually moved. The petitioner's counsel had moved for a separate sample of blood to be taken at the same time, pre-trial, and asked for permission to send that for independent testing. And the court granted that. And that's at JA-337. And so we have, even if, Your Honors, you wouldn't agree that as a general matter, you would expect a reasonable petitioner, a defendant in this context, to do, ask for a further investigation of his blood type. In this case, we have very specific facts, where the circumstances are that they had asked, they had actually made that ask. They recognized that they could. They recognized the importance of it. And the counsel just didn't proceed with actually sending that out. So we think, if you look at what is the claim, which is a broad-based attack on the serological evidence, what are the minimum facts necessary? That's you find, finding that the blood type of the petitioner was incorrect, because that opens the gate. That gets you in the door. And then you look at when could he have reasonably discovered that with reasonable diligence. I think it's pre-trial. And so 2244d1d does not extend the time. And, again, because this conviction occurred before EDPO was passed, he had a lot of time to file a post-conviction state habeas petition to toll the time for filing his federal habeas petition. He had until April of 1997. And what they're asking for is an extension of that time. And we think, under the facts and circumstances here, that that doesn't make any sense. Now, they rely on Zane III. And with respect to my friends on the other side. Ms. Gallagher argued that the reason he couldn't have, he didn't have access to the now newly discovered evidence about the blood testing or lack thereof was because he didn't find out that his attorney didn't do what he said he was going to do. Yes, Your Honor. Until a much later date. What's your response to that argument? Yes, Your Honor. And I think it's important to distinguish there, there's two potential claims. I think the first claim is the false serological evidence, the errors of the crime lab. And I think if we're just talking about that, as the Supreme Court said in Coleman v. Thompson and a number of other cases, the petitioner is charged with the actions of his client. I'm sorry. The client is charged with the actions of his attorney. So that's how we evaluate that claim. Now, if they then want to turn and say, okay, well, we also have an ineffective assistance of counsel claim, right, because he failed to actually do what the court order asked him, that's a different claim. And we can talk about when he could have reasonably discovered the factual predicate for an ineffective assistance of counsel claim. And I think the answer to that is at a point in time that was, again, much earlier than when they filed the first state habeas petition, which was in 1998. He was convicted in 1991. His appeal went up to the West Virginia Supreme Court and was denied in 1992. At any point after that, when he had gotten his court file to consider post-conviction relief, he would have had, again, through just a reasonable diligence through looking through the court file to evaluate what his post-conviction claims might be in the five years between 1992 and 1997. He could have very easily discovered that, hey, there is a court order here that ordered my counsel. And he knew, he had actual knowledge that a blood sample had been taken from him. And he could have discovered those two facts and the further fact that there is nothing in the record that reflects the lab results, the independent lab testing results. So our answer, Judge Thacker, to that is even if they pivot to the ineffective assistance of counsel, 2244D1D still does not extend the time. My question is what difference all this good evidence is going to make based on his own testimony? Your Honor, we agree with that and we think Magistrate Judge Tinsley and the PFNR was correct on that. Now, there is a question as to whether you evaluate that for a 2244D1D purposes at the opening stage. And we don't think it's necessary for this Court to get into that potentially complicated question because we think for all the reasons I've articulated, they didn't, he didn't act reasonably diligently. But you are absolutely correct. The blood type, we can talk about the blood type error first. That, Judge Traxler, as you mentioned, was never, the trooper Myers never testified to the specific blood type. What he testified to was that there was blood that was found on the running board of the van that was consistent with Gray's blood type. And he testified to the fact that apparently he got wrong. And it doesn't make a difference because the only thing that testimony goes to is whether Gray was in the van. And Gray himself has admitted he was in the van. The dispute here is whether or not the victims were dead before they were dumped in Tank Hill or whether they were, or Artisa Bennett was killed on Tank Hill. But whether he was in the van with the victims is not in dispute. And so as Magistrate Judge Tinsley said, Trooper Myers was not material to that question. And so I don't think it makes a difference. I did want to address Zane 3 very quickly because I think, with respect to my friends on the other side, I think they have overstated what that case stands for. I think they are conflating Zane 3 with Zane 1. Zane 1 was extraordinary. Fred Zane committed systematic errors. We do not in any way condone what he did. And that caused the West Virginia Supreme Court, in issuing Zane 1, to find, as a matter of law, that the findings, that the errors that Fred Zane had committed were new facts, were new facts that could not be diligently discovered. Zane 3 does not go that far. In fact, Zane 3 rejects that idea. Zane 3 is talking about other troopers in the state police lab other than Fred Zane. And it specifically says that there is no finding of systematic misconduct, and that while we are permitting these defendants who were convicted between 1979 and 1999, involving serologists other than Fred Zane, to have a state habeas hearing, we are not concluding, as a matter of law, that they are entitled to a new trial. And that means they must satisfy the Frazier factors, which means they must prove that the new evidence that they are claiming that requires a new trial is new evidence that is, A, not cumulative, and, B, that could not have been otherwise discovered through diligence. Those are the very questions we're talking about here. So I don't think it's fair to say, as they have said in their brief, that Zane 3, and I have the cite here, I don't think it's fair to say, as they say in their brief, that Zane 3 found, as a matter of law, that this is new evidence. This is in their brief at page 24. Or in their reply brief, that Zane 3, quote, was a seismic shift in their reply at page 19. That is, I would urge this Court, of course, to read Zane 3 yourselves, and I think you will see if you compare it to Zane 1, that's not what Zane 3 was about. So the question for Zane 3 is, does it create a new claim? Is it factual evidence that is not cumulative? And I think, again, if you look at the Second State Habeas Petition, and, again, that's incorporated by reference as his federal claim. If you look, starting on JA page 64, you will see that the way Petitioner Gray explained this, and, again, he was counseled when he filed the Second State Habeas Petition. So there's some suggestion in the other side's brief that Magistrate Judge Tinsley and Judge Copenhaver didn't give sufficient deference to the fact that he was pro se, but his Second State Habeas Petition was counseled. And the way he describes his false evidence claim there is, you'll see it pops up repeatedly. The blood type was incorrect. That calls into question everything that they did. And then he says, essentially, and then Zane 3 came out in 2006, and that confirmed everything that I thought about Trooper Myers and the errors in the serological evidence. That is textbook cumulative evidence under the cases that we cite, which includes Rivas, which includes McAleese. As the Third Circuit said in this case, McAleese, Petitioner, quote, that make up his claims, the vital facts, the minimum facts necessary to plead the claim, with further evidence that might support his claim. So you would oppose delaying, our delaying a decision in the case to let him exhaust his state court remedies because his claim is clearly without merit? Or clearly untimely, yes, or without merit. We would say, one, untimely. Two, Judge Floyd, as you suggested, we actually don't think he could win. I think under the Waddell case that Judge King decided you could reach that if you think it would avoid wasting everybody's time because you don't think that this evidence is relevant. And then, so, I don't think, Your Honor, we at the state don't think you need to reach exhaustion. I think if you felt like you needed to reach exhaustion, if you ruled against us on timeliness, we would urge you to remand that question to the district court because the magistrate judge and the district court judge specifically did not reach the question of exhaustion. And this, Judge Thacker, as you suggested, it is in many ways a question of first impression for this circuit. The inordinate delay doctrine, while it's talked about in unpublished opinion, what this court doesn't have is an opinion that talks about what happens if the petitioner himself contributes to that delay. And even on exhaustion, we would oppose the idea that there has been an inordinate delay. Yes, I don't contest it. It's gone on for a very long time. But after he filed his first state habeas petition, Judge Thacker dismissed it. He acted on it right away. Now, it turns out he was wrong. West Virginia Supreme Court reversed that and, you know, reversed it for more findings, but he acted on it. And there has been progress over the years. Maybe there's been a little bit too much time in between, but it's been a combination of the courts, his appointed counsel, and again, Your Honor, I would urge you to read the record if you get to the exhaustion question, and then actions by petitioner himself. In 2010, he filed a writ for a writ of mandamus with the Supreme Court of Appeals to stop the state circuit court from proceeding with his habeas claim. So I just think it would be very difficult to square these things, and I certainly don't think this Court, the Court of Appeals, would be the first place to make a decision on that. I think if you were to conclude that 2244d1d somehow applies here, if you were to conclude that you shouldn't reach the merits under Waddell, and you think that you need to reach exhaustion, I would urge this Court to remand on that question. And unless there are further questions, we would urge you to affirm the district court. Thank you. Mr. Curtis. May it please the Court, I am Brennan Curtis, and I have a few quick points on rebuttal. First, in regards to relevance, I'd like to point out that in the state's rebuttal, after all evidence had been introduced, it still felt the need to tell the jury that we didn't want you to have any doubt in your minds that the pile of clothes where we obtained these pants with Artisa's blood, the victims, was Calvin's clothing, and it just so happens to have Artisa Bennett's blood on it. This was in the state's rebuttal, and there was tellingly no murder weapon found in this case, and the two minor children that testified never testified to seeing that murder weapon in Mr. Gray's hand. So when and where Artisa Bennett died and where blood would and wouldn't have been was a clear issue in this case. In regards to Zane 3, we are not arguing that Zane 3 is Zane 1. Zane 1 threw out all evidence in regards to specifically Fred Zane, but Zane 3 was extraordinary. It created extraordinary remedies in the West Virginia state habeas courts, and for one, it eliminated claim preclusion, and the court dictated to the state habeas courts that they should do a searching review of the serology evidence. I would like to address Mr. Lynn's timeliness argument because he makes a pretty strong argument that the petitioner could have had independent testing done prior to trial and also at least after 1992 would have had the opportunity to recognize that his attorney did not get that done. Your Honor, first I would say that this was never addressed below by the district court. So in regards to any specific factual findings, we believe that those would be most appropriate for the lower court. But I want to point out one specific piece of evidence from the Zane 3 report, and Your Honor asked about can a legal decision be a new factual predicate, and it can so long as it's not an abstract principle of law, and that's from Shannon v. Newland, a Ninth Circuit case. Well, that's a Ninth Circuit case. Yes, that is correct, Your Honor, but in this case, because it was a factual investigation underlying the serologists in the case, it should be considered a new factual predicate. And going back to your original question, in regards to Zane 3, there was a determination that in regards to the absence of the victim's blood on Mr. Gray's shoes, this was an unreported exclusion by the state serologist. And I believe it's on – excuse me one second here. This is on page – this is on page 354 of the appendix, and this is citing the Zane 3 investigation. And it specifically says in the table that this was not on the report and that it was not reported by Trooper Myers. So there's no way that Mr. Gray could have found out this information earlier. Finally, I'd like to quickly touch on this cumulative evidence doctrine. And the state's argument is belied by the record. Every time that Mr. Gray has made this claim, every judge has said that this is pure speculation. Mr. Gray wouldn't have been able to bring any claim questioning Trooper Myers' testimony in regards to the victim's blood type as opposed to his own blood type, and he had no specific evidence in 1998 in regards to Trooper Myers deliberately changing his underlying report, the identifiers in that underlying report, had no specific evidence in regards to these shoes, the lack of the victim's blood on his shoes, and had no specific evidence in regards to the grouping errors that the Zane 3 investigation identified. And for these reasons, we think that your resolution of the case, Judge Traxler, as a time limit to the state habeas proceeding would be a perfectly fair resolution. Thank you. All right, thank you. I appreciate the Virginia Law School providing representation to this client, and they did the usual fine job. I'll ask the clerk to adjourn court, and then we'll come down and greet counsel.
judges: William B. Traxler, Jr., Henry F. Floyd, Stephanie D. Thacker